1999 UT App 017

**STATE of Utah, Plaintiff and Appellee,**

v.

**Douglas B. JAMES, Defendant and Appellant.**

**No. 971544–CA.**

Court of Appeals of Utah.

Jan. 28, 1999.

D. Bruce Oliver, Salt Lake City, for Appellant.

Tony C. Baird, Logan, for Appellee.

Before GREENWOOD, Associate P.J., BILLINGS and JACKSON, JJ.

## OPINION

JACKSON, Judge:

¶ 1  Douglas B. James appeals the trial court's denial of his motion to suppress evidence and his consequent conviction for drunk driving under Utah Code Ann. § 41–6–44 (1998).  We reverse.

## BACKGROUND

¶ 2  When reviewing a trial court's order on a motion to suppress evidence, we recount the facts in a light most advantageous to the trial court's decision.  *See State v. Anderson,* 910 P.2d 1229, 1230 (Utah 1996).

¶ 3  While parked on the shoulder of State Road 101 at a traffic stop, Utah Highway Patrol Trooper Kendrick was approached by a citizen who reported he had just seen a pickup truck either strike or almost strike three other vehicles.  The citizen gave the trooper the truck's license number, make, color, and direction of travel.  Trooper Kendrick ran the license number through dispatch, got the registered address, and drove there.  As he neared the address, he saw the truck described by the citizen pull into the driveway.  He stopped behind the truck, left his car, and approached the truck's driver's side door.  He looked in the window and ensured his safety was not threatened by the truck's occupants, a male driver and female passenger.  He then may or may not have knocked on the window, but, without necessarily waiting for a response, opened the door.[1]

¶ 4  Upon opening the door, Trooper Kendrick asked the driver, James, to exit the truck.  He saw containers of beer in the truck, one of which was open, and smelled alcohol.  The two walked to the front of the truck, where Trooper Kendrick asked for James's driver's license.  During their interaction, Trooper Kendrick smelled alcohol and observed James's slurred speech, flaccid face, and droopy, bloodshot eyes.  The trooper then told James that he was there to investigate the citizen's report, and together they scanned the truck for signs of damage, finding none.  At that point, James and· the female passenger became difficult.  Fearing for his safety, Trooper Kendrick asked James to stay put and went to his car to call for backup.  James disobeyed the trooper's request and went inside his home.

¶ 5  When the backup trooper arrived, he and Trooper Kendrick entered the attached garage through the open garage door.  The troopers knocked on the door leading from the garage into the house and told James that, if he did not come out, they would come in to get him.  James came out and performed one field sobriety test, which he failed, then refused any further tests.  The troopers arrested him for drunk driving and having an open container of alcohol in his truck.

¶ 6  Before and during trial, James moved to suppress all evidence obtained by the troopers.  He argued that the troopers had violated his Fourth Amendment rights in three ways: (1) Trooper Kendrick lacked reasonable suspicion to stop his truck based on the citizen's report; (2) Trooper Kendrick illegally "searched" his truck by opening the door without probable cause; and (3) the troopers lacked the probable cause and exigent circumstances necessary to enter his garage without a warrant and arrest him.  The trial court denied his motions.  The jury went on to convict James of drunk driving, but acquitted him of the open container violation.

¶ 7  James appeals, reviving each of his Fourth Amendment arguments.  Because we reverse the trial court's ruling regarding his second argument, we need not reach his first and third arguments.[2]

---

1.  At first, the trooper stated that he opened the door himself because sometimes it is difficult to see into pickup trucks.  However, in response to further questioning, the trooper admitted that he looked into the truck for a moment and believed its occupants posed no threat before he opened the door.  In fact, he believed the occupants probably did not even know he was there before he opened the door.  Consequently, it appears the trooper did not open the door based on a safety concern.  And, the State does not raise the issue of officer safety in this appeal.

2.  Regarding James's third argument, without the tainted evidence obtained as a result of Trooper Kendrick's prior illegal search of the truck, we conclude the troopers had no probable cause to arrest James.

## ANALYSIS

¶ 8   James contends that Trooper Kendrick violated his Fourth Amendment rights by searching his truck without a warrant and without an exception to the warrant requirement.[3]   Specifically, James argues that the trooper needed probable cause to open the door to his truck because opening the door constituted a search under the Fourth Amendment.   James thus asserts that any evidence obtained after the trooper opened the door should be suppressed and his conviction reversed.

¶ 9   With the burden of showing that the trooper's action was lawful, see State v. Larocco, 794 P.2d 460, 470 (Utah 1990), the State rejoins that Trooper Kendrick was entitled to open the truck door as part of a legitimate investigative detention under Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).   Alternatively, should we hold that opening the door constituted a search, the State effectively concedes the trooper lacked probable cause to search by simply urging us to apply the inevitable discovery doctrine to affirm the trial court's ruling.

¶ 10   The trial court entered no findings of fact; however, the pertinent facts derived from the record are undisputed.   We thus treat this appeal as involving only questions of law and review the trial court's ruling for correctness.   See State v. Palmer, 803 P.2d 1249, 1251 (Utah Ct.App.1990).

### I.   Legality of Opening the Door

¶ 11   "Although a person has a lesser expectation of privacy in a car than in his or her home, one does not lose the protection of the Fourth Amendment while in an automobile."   State v. Schlosser, 774 P.2d 1132, 1135 (Utah 1989) (citation omitted); see also New York v. Class, 475 U.S. 106, 114–15, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986) ("[A]

car's interior as a whole is ... subject to Fourth Amendment protection from unreasonable intrusions by the police.").   Upon stopping a driver to investigate a possible traffic violation, an officer may temporarily detain the driver, passengers, and vehicle to examine the vehicle registration and driver's license.   See Schlosser, 774 P.2d at 1135. For protection, the officer may also direct the driver to exit the vehicle.   See id.   If no arrest ensues, the officer may conduct a warrantless search of the vehicle only when (1) probable cause supports it or (2) the officer is able to articulate reasonable suspicion that the suspect may be dangerous.   See id.

¶ 12   It is well settled that a police officer's opening of a vehicle's door constitutes a search.   See Class, 475 U.S. at 115, 106 S.Ct. at 966 (holding that officer's opening of driver's side door to see vehicle identification number was search under Fourth Amendment); Larocco, 794 P.2d at 466 (concluding that "constitutional privacy interest exists in the interior of an automobile and that the opening of the car door by the police officer here constituted a search"); Schlosser, 774 P.2d at 1137 (stating that officer's "action of opening the car door constituted a search, not an investigative detention, and therefore, the probable cause standard was correctly applied by the trial court"); see also Arizona v. Hicks, 480 U.S. 321, 325, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987) (stating that even minor intrusion beyond legitimate scope of initially legal investigation violates Fourth Amendment); Commonwealth v. O'Connor, 21 Mass.App.Ct. 404, 487 N.E.2d 238, 239–40 (1986) (suppressing evidence from car stop because "officer had no right to open the car door").   We must thus initially reject out of hand the State's rather cursory contention that Trooper Kendrick's action was not a search, but part of his valid investigative detention of James.

---

3.   The Fourth Amendment reads:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.
   "Because the [parties] in this case failed to argue this case under the Utah Constitution's prohibition against unreasonable searches and seizures, we confine our analysis to the protections granted under the Fourth Amendment to the United States Constitution." State v. Northrup, 756 P.2d 1288, 1290 n. 4 (Utah Ct.App.1988).

¶ 13   Further, we need not dwell on grounds that would legitimate this search—i.e., officer safety or probable cause. *See Schlosser*, 774 P.2d at 1135. By not arguing them, the State effectively—and correctly, we add—concedes that these grounds do not exist here. We thus conclude that Trooper Kendrick conducted an unlawful search of James's truck when he opened the door.

¶ 14   This Fourth Amendment violation triggers the exclusionary rule which requires that the trial court suppress "the fruits of th[e] violation." *State v. Genovesi*, 909 P.2d 916, 919 (Utah Ct.App.1995). The tainted evidence of James's intoxication was not excluded in this case and resulted in James's conviction. We therefore must overturn his conviction and order a new trial unless: (1) an exception to the exclusionary rule applies to redeem the State's evidence or (2) admission of the evidence was harmless error. *See id.*

## II.   Inevitable Discovery Exception

¶ 15   To save its evidence and this conviction, the State pins its hopes on just one exception to the exclusionary rule: the inevitable discovery doctrine.[4] The State begins its argument by asserting that Trooper Kendrick had reasonable suspicion to detain James for investigation.[5] Thus, the State contends, aside from the trooper's illegal opening of James's door, it was inevitable that James would eventually exit the truck to enter the house and that Trooper Kendrick would then be able to observe the same evidence as he did when he opened the door. The State notes that "Trooper Kendrick would have made personal contact with the Defendant and detected the odor of alcoholic beverage coming from his person and observed the other signs of alcohol consumption on the Defendant." [6]

¶ 16   The inevitable discovery doctrine may best be understood in the context of the policies underlying the exclusionary rule. In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the leading case on inevitable discovery, the Supreme Court stated that the "core rationale" behind the exclusionary rule is "that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections." *Id.* at 442, 104 S.Ct. at 2508. The Court held, however, that the deterrence rationale has no bite when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509. The Court explained that allowing otherwise tainted evidence in under this, the inevitable discovery rule, is fair because the State will not have gained an advantage at trial and the defendant will not have been prejudiced. *See id.* at 447, 104 S.Ct. at 2511. The Court stated, "Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would

---

**4.**  Because the State prevailed below against James's argument that Trooper Kendrick's opening of the door was unlawful, the State had no occasion to raise the inevitable discovery doctrine before the trial court. However, while it is true that the doctrine's application is often "fact[ ]sensitive," we may analyze the State's contentions without resort to remand as the State has not alleged facts meeting the legal requirements of the doctrine. *State v. Palmer*, 803 P.2d 1249, 1253 (Utah Ct.App.1990).

**5.**  For purposes of our analysis, we assume without deciding that the trooper had valid reasonable suspicion to stop James.

**6.**  The State suggests that, although Trooper Kendrick had reasonable suspicion to detain James for investigation of traffic violations, if the trooper had done things lawfully, he inevitably would have stood around and waited for James to exit the truck at his leisure before contacting him.

We certainly would not want to appear to endorse this notion. We would expect an officer with reasonable suspicion for a stop to be assertive in securing his or her safety and in investigating a possible violation. As we have already noted, an officer with reasonable suspicion is allowed, for example, to contact the driver, examine the vehicle registration and driver's license, and order the driver from the car. *See State v. Schlosser*, 774 P.2d 1132, 1135 (Utah 1989). Our holding simply recognizes that—absent an arrest, an articulable threat to officer safety, or probable cause—the officer may not also open the car door in the course of his or her investigation. We presume the State's point is that if Trooper Kendrick had followed normal procedures for contacting James and investigating the alleged traffic violations he inevitably would have discovered the smell of alcohol and other signs that James was drunk.

have occupied without any police misconduct." *Id.*

¶ 17 *Nix* involved the murder of a young girl. *See id.* at 434, 104 S.Ct. at 2504. The defendant had disposed of the girl's body outdoors, then surrendered and was brought in for questioning. *See id.* at 435, 436, 104 S.Ct. at 2504, 2505. Violating the defendant's Miranda rights, the police elicited from the defendant the location of the body. *See id.* at 437, 104 S.Ct. at 2506. Meanwhile, a search team had been organized to search for the body and the search trajectory had been on course to find the body. *See id.* at 448–50, 104 S.Ct. at 2511–12. The defendant argued that his illegally obtained statement and its fruits—i.e., the body as evidence—must be suppressed. *See id.* at 436–37, 104 S.Ct. at 2505. However, the government countered with proof that the ongoing, independent search inevitably would have discovered the body. *See id.* at 437–38, 104 S.Ct. at 2506. Based on that proof, the Supreme Court held that the body was properly admitted as evidence at trial. *See id.* at 449–50, 104 S.Ct. at 2512.

¶ 18 The Tenth Circuit has interpreted *Nix* to mean that "the inevitable discovery exception applies whenever an *independent investigation* inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." *United States v. Larsen,* 127 F.3d 984, 986 (10th Cir.1997) (emphasis added). We are persuaded that requiring an independent investigation is sound policy. Otherwise, the inevitable discovery exception would swallow the exclusionary rule by weakening the rule's deterrent effect. *See United States v. Rullo,* 748 F.Supp. 36, 44 (D.Mass.1990). Only by proof of an inevitable independent investigation can we be sure that the evidence is absolved of the taint.

¶ 19 Courts have described an independent investigation as "a substantial, alternate line of investigation," *United States v. Hammons,* 152 F.3d 1025, 1029 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 849, —— L.Ed.2d ——, 1999 U.S. LEXIS 484 (1999);

"an entirely independent investigation," *United States v. Halls,* 40 F.3d 275, 277 (8th Cir.1994); " 'legal means [that are] truly independent,' " *United States v. Ford,* 22 F.3d 374, 377 (1st Cir.1994) (quoting *United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986)); "intervening and independent," *United States v. Cherry,* 759 F.2d 1196, 1205 (5th Cir.1985); and "appreciably attenuated by intervening circumstances," *United States v. Warren,* 997 F.Supp. 1188, 1195 (E.D.Wis. 1998).

¶ 20 Beyond these descriptions, factors that may be persuasive in determining whether the State's proposed investigative scenario meets the independent investigation test are (1) a showing that the other investigation "was already underway when a constitutional violation occurred" (although "it is possible for an investigation that begins after the violation to be independent"), *Larsen,* 127 F.3d at 987; (2) "[t]he participation or intervention in the lawful search of officers who were not involved in the police misconduct," *Rullo,* 748 F.Supp. at 44; and (3) analogous to attenuation analysis, the "temporal proximity" between the illegal investigation and the inevitable independent investigation, *State v. Anderson,* 165 Wis.2d 441, 477 N.W.2d 277, 281 (1991).

■ ¶ 21 Here, the State has not presented any evidence that an entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation was inevitable. The State posits only a vague theory about what Trooper Kendrick's lawful actions might have been if he had not acted illegally. The State essentially theorizes about a *substitute* investigation, not an *independent,* parallel investigation.

¶ 22 The inevitable investigation proposed by the State was not ongoing at the time of the tainted investigation,[7] nor was it to be conducted by officers not involved in the tainted investigation. *See Larsen,* 127 F.3d at 987; *Ford,* 22 F.3d at 377; *Rullo,* 748 F.Supp. at 44. Further, analogous to attenuation analysis, the "temporal proximity" between the illegal investigation and the pro-

---

7. We emphasize that the fact that an independent investigation has arisen before the illegal act is not dispositive, but it is "strong proof" of

independence. *United States v. Larsen,* 127 F.3d 984, 987 (10th Cir.1997).

posed inevitable investigation would have been quite short, a matter of seconds—particularly as the proposed investigation would have replaced the illegal investigation. *Anderson*, 477 N.W.2d at 281.

¶ 23 "Here, the unconstitutional search ... tainted the only police investigation" involved. *United States v. Owens*, 782 F.2d 146, 152 (10th Cir.1986). Because the State has not met its burden of presenting evidence of an independent investigation, we conclude as a matter of law that the inevitable discovery rule does not apply.[8] Thus, all evidence obtained by Trooper Kendrick was tainted and should have been suppressed. As that evidence was critical to James's conviction, we cannot say the error of allowing it to be presented to the jury was harmless. *See State v. Northrup*, 756 P.2d 1288, 1296 (Utah Ct.App.1988). Consequently, we reverse James's conviction and remand for proceedings consistent with this opinion.[9]

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.

8. The deterrence policies underlying the exclusionary rule also favor suppressing this evidence. If we were to hold under the inevitable discovery doctrine that police could substitute lawful behavior for unlawful behavior in these situations to "untaint" evidence, officers would have no reason to refrain from opening car doors in every car stop from now on. We must guard the constitutional right of our state's residents and visitors to be free from illegal searches by the government.

9. We reject James's one-sentence request for attorney fees. He has not stated a legal basis upon which we can consider his request.