2000 UT 80

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Douglas B. JAMES, Defendant and Respondent.**

No. 990267.

Supreme Court of Utah.

Oct. 3, 2000.

Jan Graham, Att'y Gen. Christine F. Soltis, Asst. Att'y Gen., Salt Lake City, Tony Baird, Logan, for plaintiff.

D. Bruce Oliver, Salt Lake City, for defendant.

## ON CERTIORARI TO THE UTAH COURT OF APPEALS

DURRANT, Justice:

¶ 1 The State petitioned for review of a court of appeals' decision reversing the trial court's denial of Douglas B. James's motion to suppress evidence. After the trial court denied James's motion to suppress, he was convicted of driving under the influence of alcohol. On appeal, the court of appeals held that a police officer violated James's Fourth Amendment rights when he opened the door of James's truck, while James was seated inside the truck, for the purpose of investigating a citizen's report of reckless driving. *See State v. James*, 1999 UT App 17, ¶¶ 11–14, 977 P.2d 489. The court of appeals also held that the inevitable discovery doctrine was inapplicable. *See id.* at ¶¶ 15–23. We granted certiorari, *see State v. James*, 984 P.2d 1023 (Utah 1999), and now reverse the court of appeals.

## BACKGROUND

¶ 2 On March 16, 1996, a citizen approached Utah Highway Patrol Trooper Jason Kendrick and reported that he had just seen a reckless driver. The citizen stated that a dark-colored pickup truck was "all over the road" and had "hit or ... almost struck" three other vehicles. The citizen was able to provide Kendrick with the truck's license number, approximate location, and direction of travel. Kendrick contacted highway patrol dispatch and confirmed that the license number matched the vehicle description provided by the citizen. Kendrick obtained the registered address of the truck's owner and drove to that address. As he neared the residence, he saw a truck matching the citizen's and dispatcher's description enter the driveway, where it stopped and remained with its brake lights on. Kendrick pulled up behind the truck with his headlights on, left his patrol car, and approached the truck's driver's-side door. During the time it took Kendrick to stop and approach, no one attempted to leave the truck.

¶ 3 Kendrick looked in the window and saw two persons, James, who was in the driver's seat, and a female in the passenger seat.[1] Kendrick opened the door and asked the

---

1. At the suppression hearing, Kendrick indicated that he had some concerns for his safety due to the high profile of the truck, which prevented him from observing what was taking place in the cab of the truck below his line of vision.

driver, James, to get out of the truck. Once the door was open, Kendrick saw a 12–pack of beer on the passenger-side floor of the cab, with one can opened. Kendrick and James walked to the front of the truck, where Kendrick asked to see James's driver's license. James dropped his license when he pulled it from his wallet. Kendrick noted that James smelled strongly of alcohol, his face was flaccid, his speech slurred, and his eyes were droopy and bloodshot. Kendrick also observed that James "appeared to be unstable, unable to stand straight" without keeping his feet apart or moving. Kendrick expressed concern about the possibility that James had been involved in an accident. Kendrick and James walked around the truck and scanned it for signs of damage, but found none.

¶ 4 At about this time, the female passenger left the vehicle and "was very upset . . . yelling, screaming, that kind of thing." Kendrick became concerned for his safety, told James to remain where he was and returned to his patrol car to call for backup. James instead went inside his home. When the backup officer, Trooper Arlow Hancock, arrived, he and Kendrick entered the attached garage through the open garage door. They knocked on the door leading from the garage into the house and told James that if he did not come out they would come in to get him. James came out and performed a standard field sobriety test, which he failed. When James attempted to walk away again, the officers arrested him. James was taken to the Cache County jail, where he refused to take any further sobriety tests or a breathalyzer test. The State charged James with driving under the influence and having an open container of alcohol in his vehicle.

¶ 5 At trial, James moved to suppress evidence of his intoxicated condition. He asserted three Fourth Amendment grounds for suppression: (1) Kendrick initially lacked reasonable suspicion to stop his truck or detain him; (2) Kendrick opened the door to his truck without probable cause; and (3) Kendrick and Hancock lacked the probable cause and exigent circumstances necessary to enter his garage without a warrant. The trial court denied James's motions. A jury

convicted James of driving under the influence, but acquitted him on the open container charge.

¶ 6 On appeal, the court of appeals addressed only the argument relating to Kendrick's opening of the truck door. The court of appeals ruled that the officer's opening of the vehicle door constituted a search of the vehicle rather than an investigative detention and that the search was illegal. *See James,* 1999 UT App 17, ¶¶ 12–14, 977 P.2d at 489. It then discussed the "inevitable discovery" exception to the warrant requirement and concluded that the exception was inapplicable. *See id.* ¶¶ 15–22.

¶ 7 We granted the State's petition for certiorari. On certiorari review, the State argues that the court of appeals construed cases prohibiting police from opening a vehicle door in certain circumstances too broadly and out of context. Specifically, the State contends that where an officer has the right to order a person to temporarily leave a vehicle, the officer's mere opening of a vehicle door cannot constitute an illegal search. The State also argues that the court of appeals erred in its application of the inevitable discovery doctrine.

## ANALYSIS

¶ 8 "On certiorari, we review the decision of the court of appeals, not the decision of the trial court." *State v. Harmon,* 910 P.2d 1196, 1199 (Utah 1995). "'We review the court of appeals' decision for correctness and give its conclusions of law no deference.'" *Carrier v. Pro–Tech Restoration,* 944 P.2d 346, 350 (Utah 1997) (quoting *Newspaper Agency Corp. v. Auditing Div.,* 938 P.2d 266, 267 (Utah 1997)).

¶ 9 We begin our analysis with a brief statement of two fundamental and related tenets of Fourth Amendment caselaw. First, the presumptive rule relating to reasonable searches and seizures is that searches may not be conducted without a warrant supported by probable cause. *See Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). There are a number of "exceptions" to the presumptive rule, however. *See id.* The application of

those exceptions is guided by the second tenet, which is that the fundamental right protected by the Fourth Amendment is a person's reasonable expectation of privacy. *See United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

¶ 10 Due to the mobile nature of vehicles and their highly-regulated status, persons traveling in vehicles have a lesser expectation of privacy than they would have within a private dwelling. *See California v. Carney*, 471 U.S. 386, 391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see also Cady v. Dombrowski*, 413 U.S. 433, 442, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The so-called "automobile exception" to the warrant rule applies regardless of whether the vehicle is actually in motion at the time. *See Carney*, 471 U.S. at 391, 105 S.Ct. 2066. Under this exception to the warrant rule, officers may temporarily detain a vehicle and its occupants upon reasonable suspicion of criminal activity for the purpose of conducting a limited investigation of the suspicion.[2] *See Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Delaware v. Prouse*, 440 U.S. 648, 659, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Reasonable suspicion may be based on information provided by a citizen if that information, coupled with available corroboration, is suffi-

ciently reliable under the totality of the circumstances. *See Alabama v. White*, 496 U.S. 325, 330–32, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Owing to inherent safety concerns and the limited nature of the intrusion, officers may order the occupants of a vehicle to leave the vehicle during the course of the investigation. *See Maryland v. Wilson*, 519 U.S. 408, 412–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).[3]

¶ 11 The specific issue on certiorari in this case concerns the Fourth Amendment propriety of opening the driver's-side door of James's truck for the purpose of speaking to James and requesting that he step out of the vehicle. As a preliminary matter, we note that the facts of the case definitively demonstrate that Kendrick's detention of James was based on more than adequate reasonable suspicion.[4] Kendrick's investigation was founded on a citizen's detailed report of a reckless driving pattern that was consistent with driving under the influence. The citizen's identification of the license plate and description of the truck were corroborated in all material respects by the highway patrol dispatch office, and, subsequently, by Kendrick's own observation. Kendrick also viewed James's pickup pulling into the driveway at the registered address. Thus, under the totality of the circumstances, Kendrick had the right and the authority to temporarily detain James and investigate the report of reckless driving.[5] It follows that Kendrick

---

2. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

3. James asserts that the State has raised concerns relating to officer safety for the first time on appeal. This argument is misplaced. It is clear that the safety concerns guiding the Supreme Court's decision in *Mimms* do not depend on any particular showing that an officer was at heightened risk due to the unique circumstances of a given automobile stop, *see, e.g., Knowles v. Iowa*, 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (noting greater risks accompanying arrest of vehicle's occupants, which justify protective search of vehicle to ensure no weapons are present), but rather are of an inherent and general nature. *See Mimms*, 434 U.S. at 108–10, 98 S.Ct. 330 (officer required defendant

to step out of vehicle as a routine precautionary measure). Hence, the "issue" of officer safety is not a distinct argument, subject to waiver analysis. It is instead an inherent aspect of the governing caselaw, which we are not at liberty to disregard.

4. Although the court of appeals did not address this issue at any length, we must necessarily dispose of it to reach the question presented on certiorari.

5. In *Kaysville City v. Mulcahy*, 943 P.2d 231, 235–36 (Utah Ct.App.1997), the court of appeals noted that the inherent reliability of information volunteered by a citizen will usually be much greater than that provided by an anonymous tip or by a paid informant. As such, the necessity of corroborating observation or information is correspondingly reduced for purposes of the totality of the circumstances analysis. *See id.*

was legally authorized to order James to step from the cab of his truck.[6] *See Mimms*, 434 U.S. at 110–11, 98 S.Ct. 330; *State v. Schlosser*, 774 P.2d 1132, 1135 (Utah 1989). He needed neither consent nor a warrant to make this request.

¶ 12 The court of appeals' analysis overlooks the fundamental distinction between detention and questioning of James himself (a procedure specifically authorized by *Mimms*) and a search for physical items of evidence not in plain view, such as narcotics or firearms. In this regard, we note that the issue of Kendrick's discovery of the open container is not before us, nor was it an issue before the court of appeals. James was acquitted on the open container charge.

¶ 13 James's defense of the court of appeals' decision further assumes that there is a functional distinction between Kendrick's opening the door himself and his requiring James to open it. The court of appeals cited *State v. Larocco*, wherein this court established, by plurality decision, a rule prohibiting warrantless searches of vehicles in the absence of probable cause and exigent circumstances. *See* 794 P.2d 460, 469–71 (1990) (Durham, J., joined by Zimmerman, J.) (prohibiting opening of vehicle door to examine vehicle identification number); *id.* at 473 (Stewart, J., concurring in the result); *see also State v. Anderson*, 910 P.2d 1229, 1236–37 (Russon, J., joined by Howe, J.) (reciting and applying *Larocco* rule to search of vehicle for contraband); *id.* at 1239 (Zimmerman, C.J., concurring in the result); *id.* at 1239–41 (Stewart, J., concurring in the result); *id.* at 1241–42 (Durham, J., concurring and dissenting); *Schlosser*, 774 P.2d at 1135–36 (holding that opening of vehicle door to search for contraband violated Fourth Amendment). However, all of these cases are inapposite; they addressed the opening of doors or searches of vehicles to search for physical evidence, as opposed to lawful detention and questioning of individuals. In this case, Kendrick was investigating James himself, and was not searching James's vehi-cle. Causing the door to be opened in some manner was a reasonable and practical means for obtaining compliance with Kendrick's authority to lawfully require James to step from the vehicle. As such, the opening of the door was an incidental factor in the investigation of James's impaired physical condition, and not an independent search of the vehicle. To draw distinctions as to who actually opened the door and the nature of any conversation or notification occurring beforehand would elevate form over substance. We therefore overrule the court of appeals' holding that Kendrick's opening of James's door, in the context of a lawful investigation into the reasons for James's reckless driving, constituted a violation of the Fourth Amendment prohibition against unreasonable searches.

¶ 14 Although our resolution of this issue renders immaterial the court of appeals' conclusion that the inevitable discovery exception was inapplicable, the State has expressed concern that the court of appeals' holding on that issue will establish incorrect precedent. We therefore briefly address this issue. The inevitable discovery "exception" has been described as an exception to the exclusionary rule, which dictates that evidence obtained by virtue of illegal police activity must be suppressed at trial. The exception provides that evidence that would have been obtained regardless of illegal police activity will not be suppressed because to do so would violate the underlying policy of the exclusionary rule—which is to place the police in a position that is neither better nor worse than it would have been absent the illegal activity. *See Nix v. Williams*, 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

¶ 15 The court of appeals held that the inevitable discovery exception can be satisfied only by an "entirely independent, alternate, intervening, appreciably attenuated investigation aside from the tainted investigation." *James*, 1999 UT App 17, ¶ 21, 977

---

**6.** The court of appeals noted that the evidence was not entirely clear on the question of whether Kendrick did or did not tap on the driver's window before opening the door. *See James*, 1999 UT App. 17, ¶ 3, 977 P.2d 489. The trial court, in its order denying James's motion to suppress, made no specific finding regarding this question, and we likewise consider it immaterial to decision of the case on certiorari.

P.2d at 489. The State maintains that these criteria are not required by the inevitable discovery exception, but are instead merely descriptive of a subcategory of cases falling within the "independent source doctrine." The State concedes that the independent source doctrine describes one method of satisfying the inevitable discovery exception, which is to demonstrate that the same evidence uncovered by illegal police activity would have been obtained by an entirely independent, prior investigation. Nevertheless, the State argues that the independent source doctrine is not coextensive with the inevitable discovery exception.

¶ 16 We agree. In *Nix*, the United States Supreme Court described the distinction between the specific requirements of the independent source doctrine and the broader dictates of the policy underlying the inevitable discovery exception. *See* 467 U.S. at 443–44, 104 S.Ct. 2501. The Supreme Court noted that the fundamental policy advanced by the inevitable discovery exception was the same as that of the independent source doctrine.

> The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position tha[n] they would have been in if no police error or misconduct had occurred.

*Id.* at 443, 104 S.Ct. 2501. Because this policy, rather than the specific nature of the investigation or investigations determines whether the exclusionary rule requires suppression of evidence, the Supreme Court concluded that the appropriate standard governing the inevitable discovery exception is whether "the prosecution can establish by a preponderance of the evidence that the information ultimately would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. 2501. This is the standard that must be met to avoid suppression and it does not neces-

sarily include the elements dictated by the court of appeals. To the extent it is appropriate to elaborate upon or elucidate the *Nix* standard, by adopting more specific requirements, we may do so in a future appropriate case. It is therefore sufficient for our purpose here to hold that the requirements adopted by the court of appeals do not correctly set forth the inevitable discovery standard.

¶ 17 In conclusion, we note that our decision of the issues presented on certiorari does not completely resolve this case. Before the court of appeals, James presented a third distinct ground for suppression of at least a portion of the evidence of his intoxication. Specifically, he argued that Kendrick and Hancock lacked the probable cause and exigent circumstances necessary to enter his garage without a warrant and arrest him. Because the court of appeals did not address this argument, *see Reese v. Reese*, 1999 UT 75, ¶ 9, 984 P.2d 987, we remand to the court of appeals for appropriate treatment.[7]

¶ 18 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.

---

7. In some circumstances, we have been willing to treat issues not addressed by the court of appeals for purposes of judicial economy. *See, e.g., State v. Brooks*, 908 P.2d 856, 861 (Utah

1995). Even were we inclined to address this issue, it has not been briefed or argued by either party on certiorari.