2019 UT App 117

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JEREMY LEE PERKINS,
Appellant.

Opinion
No. 20180154-CA
Filed July 11, 2019

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 161100060

Ryan L. Holdaway and Diane Pitcher, Attorneys
for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     Jeremy Lee Perkins challenges the district court's denial of his motion to suppress evidence obtained from a search that he argues was unconstitutional. Perkins argues that the officers did not have reasonable suspicion of recent criminal activity and his detention was therefore illegal. In the alternative, he argues that even if the detention was lawful at its inception, the detention was unreasonably long. We affirm.

## BACKGROUND

¶2     A concerned citizen met "face-to-face" with Officer Pearce to inform the officer that Perkins's girlfriend (the girlfriend) was

using and selling drugs. Among other things, the concerned citizen witnessed the girlfriend sell methamphetamine to Perkins. For the next few weeks, Officer Pearce attempted to contact the girlfriend and her probation officer, to no avail.

¶3    When the girlfriend went to the Adult Probation and Parole (AP&P) office for her monthly check-in, the probation officer informed Officer Pearce that she had arrived. Officer Pearce met with the girlfriend at the AP&P office and asked her some questions based on the concerned citizen's report. In particular, Officer Pearce asked the girlfriend if he and the probation officer would find any drugs if they searched her car. At first the girlfriend said no, but as they were walking to her car, she admitted there were drugs in the center console. The officers searched the car and collected small baggies containing crystal pieces that later tested positive for methamphetamine.

¶4    After discovering the narcotics in her car, Officer Pearce informed the girlfriend of her rights and questioned her about using and selling drugs. The girlfriend admitted to selling methamphetamine and confirmed the concerned citizen's report that Perkins was one of her customers. Initially, she told Officer Pearce that she had seen Perkins use methamphetamine that morning, but she later changed her story and claimed she had last seen him use the week before. The girlfriend lived with Perkins and his sister, and Officer Pearce asked whether there were drugs at the residence (the residence). The girlfriend said they would find only drug paraphernalia.

¶5    Officer Pearce, other officers, and a canine unit, accompanied the girlfriend back to the residence and conducted a drug sniff and a search of the common areas "as outlined in [her] probation agreement." The girlfriend lived in the basement of the residence, and Perkins and his sister lived upstairs. The drug dog alerted to narcotics in the girlfriend's bedroom and in an upstairs bathroom used by Perkins and his sister. The officers also found paraphernalia and prescription medication not prescribed to the girlfriend in her room.

¶6    Based on the information provided by the concerned citizen as well as the girlfriend's statements that she sold Perkins methamphetamine and recently saw him use it, Officer Pearce wanted to detain Perkins for further investigation. Officer Pearce contacted another officer, Officer Stirland, and instructed him to attempt to locate and detain Perkins at his workplace. According to Officer Stirland's testimony, Officer Pearce did not provide many details about the justification for or purpose of the stop.

¶7    At 11:44 a.m., Officer Stirland located Perkins in the company's parking lot and detained him.[1] Officer Stirland notified Officer Pearce, who was still at the residence where the canine unit was finishing its work. Officer Pearce told Officer Stirland that he was dispatching a canine unit to Perkin's location and to continue to detain Perkins until the unit arrived. As soon as the drug sniff at the residence had concluded, the canine unit left for Perkins's location. Due to heavy snow on the roads as well as the distance between the residence and Perkins's location, the drive took approximately twenty minutes. While waiting for the canine unit to arrive, Officer Stirland allowed Perkins to remove company-owned items from his truck and wait inside his company's office. According to the call records, the canine unit arrived at Perkins's location between 12:20 p.m. and 12:30 p.m. The drug dog alerted to narcotics in Perkins's truck within five minutes of arriving.

¶8    Meanwhile, at the residence, Officer Pearce had begun drafting an affidavit for a search warrant to obtain bodily fluids from Perkins to test for recent drug use. When he was notified

---

1. Perkins testified at an evidentiary hearing and said that Officer Stirland initiated the stop between 10:45 a.m. and 11:00 a.m. and that the canine unit arrived about thirty minutes after the stop began. The court concluded that the call log provided better evidence of the timeline than Perkins's testimony, which was based only on his recollection of the events, and determined that the stop was initiated at 11:44 a.m.

that the drug dog had alerted to the smell of narcotics in Perkins's truck, Officer Pearce revised his affidavit to include a request to search the truck. The officers decided to wait for the search warrant, which was already in progress, rather than conduct a warrantless search of the truck based on the drug dog's alert or Perkins's consent.

¶9    Officer Pearce concluded his investigation at the residence at approximately 12:45 p.m. and then traveled to Perkins's location. Officer Pearce completed the affidavit for a search warrant while another officer drove. Once they arrived on the scene, Officer Pearce electronically submitted the affidavit for the search warrant at 1:31 p.m. When he did not receive an immediate response, Officer Pearce contacted the court and learned that the magistrate judge who was in charge of signing warrants that week was not available. Officer Pearce contacted two other magistrate judges, but neither judge could access the affidavit. After contacting different agencies to resolve the issue, a magistrate judge was able to review the affidavit and the search warrant was approved at 1:59 p.m.

¶10    Officer Pearce executed the search warrant and collected a urine sample from Perkins, which tested positive for methamphetamine. A search of the truck did not uncover drugs or drug paraphernalia, but did lead to the discovery of an assault rifle. The State charged Perkins with possession of an illegal substance[2] and possession of a firearm by a restricted person.

¶11    Perkins moved to suppress the result of his urine analysis and the discovery of the firearm in his truck, arguing that his initial detention was illegal because it "was not based upon reasonable suspicion" and, even if it were, "the duration of the detention substantially exceeded what was reasonable given the

---

2. "Possession" of a controlled substance includes, among other things, "inhalation, swallowing, [or] injection." Utah Code Ann. § 58-37-2(1)(ii) (LexisNexis 2016).

information available [to the officers] at the time." Following an evidentiary hearing, the district court denied Perkins's motion to suppress, concluding that "the officer had reasonable suspicion that [Perkins] may have been in possession of illegal narcotics and acted with due diligence in pursuing the investigation thereof and obtained the necessary search warrants in a timely manner." The district court credited the call logs to establish the timeline of events and determined that the length of the detention was reasonable under the totality of the circumstances.

¶12 Following this denial, Perkins entered a conditional no-contest plea to possession of a controlled substance, preserving his right to appeal the denial of his motion to suppress under rule 11(j) of the Utah Rules of Criminal Procedure. Perkins now appeals.

ISSUES AND STANDARDS OF REVIEW

¶13 Perkins contends the district court should have granted his motion to suppress for two reasons. First, he argues that the officers did not have reasonable suspicion of criminal activity to detain him. Second, he argues that the duration of the detention was "considerably longer than necessary" to confirm or dispel the officers' suspicion of criminal activity. "We review a denial of a motion to suppress as a mixed question of law and fact and will disturb the district court's factual findings only when they are clearly erroneous, but we afford no deference to the district court's application of law to the underlying factual findings." *State v. Sosa*, 2018 UT App 97, ¶ 6, 427 P.3d 448 (quotation simplified).

ANALYSIS

¶14 The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness, which is measured in objective terms by examining the totality of the circumstances." *State v. Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650 (quotation simplified); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "Reasonableness under the Fourth Amendment depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement] officers." *Baker*, 2010 UT 18, ¶ 10 (quotation simplified).

¶15 There are "three different kinds of police-citizen encounters, each permitting a different degree of intrusion and requiring a different level of justification." *State v. Worwood*, 2007 UT 47, ¶ 21, 164 P.3d 397. "A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his will and remains free to leave." *State v. Biggs*, 2007 UT App 261, ¶ 10, 167 P.3d 544 (quotation simplified). "A level two encounter," otherwise known as a *Terry* stop, "occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Id.* (quotation simplified); *see also Terry v. Ohio*, 392 U.S. 1, 26–27 (1968). "Finally, a level three [encounter] occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect." *Biggs*, 2007 UT App 261, ¶ 10 (quotation simplified).

¶16 In this case, Officer Pearce ordered Officer Stirland to initiate a *Terry* stop and detain Perkins until a canine unit could arrive and conduct a dog sniff for narcotics. When an officer initiates a *Terry* stop, courts apply a two-step inquiry to determine whether the stop is constitutional: (1) whether the stop was justified at its inception, and (2) whether the resulting investigation was "carried out in a manner reasonably related in scope to the circumstances that justified the interference in the first place." *State v. McLeod*, 2018 UT App 51, ¶ 16, 420 P.3d 122 (quotation simplified); *see also United States v.*

*Sharpe*, 470 U.S. 675, 682 (1985). A stop is justified at its inception when the officer has reasonable suspicion of criminal activity. *See State v. Simons*, 2013 UT 3, ¶ 14, 296 P.3d 721. When officers have reasonable suspicion of criminal activity, they "must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly." *See Baker*, 2010 UT 18, ¶ 26 (quotation simplified). If officers unnecessarily prolong the detention and do not act quickly to confirm or dispel their suspicions, the once-lawful detention can become unlawful. *See McLeod*, 2018 UT App 51, ¶ 17.

¶17 Here, Perkins first argues that the stop was not justified at its inception because the officers did not have reliable information to support their belief that Perkins had recently engaged in criminal activity. Second, Perkins argues that even if the stop was justified at its inception, the resulting detention was unreasonable in length. We address each argument in turn.

A.    Reasonable Suspicion of Criminal Activity

¶18 To lawfully initiate a *Terry* stop, an officer must have reasonable suspicion that "the person has committed or is about to commit a crime." *State v. Baker*, 2010 UT 18, ¶ 16, 229 P.3d 650 (quotation simplified). Under these circumstances, "'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *State v. Simons*, 2013 UT 3, ¶ 21, 296 P.3d 721 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

¶19 Perkins's argument that the stop was unlawful at its inception focuses almost exclusively on whether the information provided by the concerned citizen was sufficiently reliable and timely to give rise to reasonable suspicion that Perkins had recently used methamphetamine. But this was not the only information on which the officers based the detention. The officers corroborated the tip when the girlfriend

confirmed that she had consistently sold methamphetamine to Perkins and had recently seen Perkins using methamphetamine, possibly as recently as that morning. Also, during the search of the residence, the officers found drug paraphernalia and a drug dog alerted to narcotics in a bathroom used by Perkins and his sister. Based on this information, Officer Pearce had reasonable, articulable suspicion that Perkins had recently committed a crime and was therefore justified in instructing Officer Stirland to detain him.[3] *See State v. Biggs*, 2007 UT App 261, ¶ 10, 167 P.3d 544.

### B. Length of Detention

¶20 Having determined that there was reasonable suspicion to detain Perkins, we must now determine whether the length of his detention was reasonable. Perkins argues that the district court should have granted his motion to suppress because the officers did not "diligently pursue a method of investigation that would quickly confirm or dispel the basis for the [detention]."

¶21 Although Perkins's detention was continuous from the initial *Terry* stop to his arrest, once the dog alerted to narcotics in his truck, the nature of the detention changed. We therefore look at two distinct time periods: (1) the time between Perkins's initial detention and the dog alert on the truck (reasonable suspicion detention), and (2) the time between the dog alert on the truck, which established probable cause to search, and the execution of the search warrant (probable cause detention).

---

3. Perkins acknowledges that, under vertical collective knowledge, an officer who has reasonable suspicion of criminal activity can instruct another officer to detain an individual, even if "the corpus of information known to the first officer" was not communicated to the detaining officer. *See State v. Talbot*, 2010 UT App 352, ¶ 15, 246 P.3d 112 (quotation simplified).

1.      Reasonable Suspicion Detention

¶22    Perkins argues that even if the officers had reasonable suspicion to detain him, his detention was unreasonably prolonged waiting for the canine unit to arrive. When determining whether the length of a detention was reasonable, we do not look at the length of the detention alone. Instead, we look to the totality of the circumstances surrounding the detention, *see State v. Baker*, 2010 UT 18, ¶ 17, 229 P.3d 650, and "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

¶23    Here, Officer Pearce was conducting parallel investigations into both Perkins and the girlfriend. Officer Pearce was still in the process of searching the residence when he ordered Officer Stirland to locate and detain Perkins. At 11:44 a.m., Officer Stirland informed Officer Pearce that Perkins had been detained, and Officer Pearce told Officer Stirland to detain Perkins until a canine unit arrived. At that time, the drug dog being used in the investigation was still finishing its work at the residence. As soon as the dog completed its sniff at the residence, Officer Pearce immediately sent the dog and its handler to Perkins's location. Given the distance between the two locations and the heavy snow, it took about twenty minutes for the canine unit to arrive. Based on the call records, the canine unit arrived somewhere between 12:20 p.m. and 12:30 p.m. and the dog alerted to the presence of narcotics within five minutes of arrival.

¶24    Under the circumstances, the thirty-six- to forty-six-minute delay until the commencement of the dog sniff was reasonable. Although we have little Utah case law directly on point, other courts have consistently held that comparable delays are reasonable where the officers promptly requested a drug dog to be transported to the scene of the stop. *See, e.g., United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006)

("Given the distance between the scene of the detention and the nearest handler, as well as [the trooper's] diligence in promptly calling the dog handler and the handler's speedy arrival, a 40-minute detention was reasonable."); *United States v. Cervine*, 347 F.3d 865, 872–73 (10th Cir. 2003) (holding that the length of the detention was reasonable where "the traffic stop, detention, and canine search of [the defendant's] vehicle lasted approximately fifty minutes"); *United States v. Villa-Chaparro*, 115 F.3d 797, 802–03 (10th Cir. 1997) (holding that the officer "acted reasonably in detaining [the defendant] for five minutes from the time he stopped [the defendant] . . . and for an additional thirty-eight minutes while he waited for the canine unit to arrive").

¶25　Perkins contends that those cases, in which reasonable suspicion arose during the course of the stop, are distinguishable. For instance, he argues that in *Villa-Chaparro*, the officer "did not know prior to stopping the defendant that he was going to be needing a drug dog," whereas in this case the officer knew that "the very purpose of stopping [Perkins] was to investigate drugs" and had "prior knowledge that the drug dog would be needed." However, Perkins ignores the fact that the officers did not know if or when Perkins would be located. As soon as Officer Stirland confirmed that Perkins had been stopped, and Officer Pearce knew that a dog sniff could take place, he promptly sent a canine unit to Perkins's location. Nothing in the record suggests that another canine unit was available that could have arrived more quickly. *See United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (holding that a fifty-nine-minute detention awaiting a drug dog was reasonable where nothing suggested that the officer "exercised suboptimal diligence" or that "a similarly trained canine unit could have reached the scene sooner"). "When police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994). Given the parallel

investigations taking place some distance apart, as well as the road conditions at the time, Perkins's thirty-six- to forty-six-minute detention while awaiting the drug dog's arrival was reasonable.

¶26   Finally, Perkins claims that his detention was unreasonable because Officer Stirland was not actively questioning him or otherwise investigating the suspected drug activity while waiting for the canine unit to arrive. While "officers must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly," *State v. Simons*, 2013 UT 3, ¶ 17, 296 P.3d 721 (quotation simplified), Perkins does not explain how subjecting him to questioning would have dispelled the officers' reasonable suspicion or reduced the length of the detention. The decision to forgo further questioning until the dog sniff was particularly reasonable in this case where the officer making the stop was not privy to the details of the investigation. Given that the police had reasonable suspicion of drug activity and promptly requested a canine unit to conduct a minimally invasive sniff to confirm or dispel their suspicions, Perkins's thirty-six- to forty-six-minute detention was reasonable.

2.      Probable Cause Detention

¶27   Perkins also challenges the length of the detention between the dog alert and the time the search warrant was executed, again arguing that the officers did not diligently pursue a method of confirming or dispelling their suspicion of criminal activity. Specifically, Perkins argues that once the drug dog alerted, the officers should have conducted a search of his truck rather than waiting for a search warrant. We disagree.

¶28   Absent an exception to the warrant requirement, officers must obtain a warrant prior to conducting a search. U.S. Const. amend. IV; *see also State v. James*, 2000 UT 80, ¶ 9, 13 P.3d 576 (explaining that there "are a number of exceptions to the presumptive rule" that "searches may not be conducted without

a warrant supported by probable cause" (quotation simplified)). One exception to the warrant requirement is the automobile exception. *James*, 2000 UT 80, ¶ 10. This exception allows officers to conduct a warrantless search of a car "so long as there [is] probable cause for the search." *State v. Rigby*, 2016 UT App 42, ¶ 12, 369 P.3d 127; *see also Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

¶29    In this case, once the drug dog alerted to the scent of narcotics in the truck, the officers had probable cause to conduct a warrantless search under the automobile exception.[4] *See Rigby*, 2016 UT App 42, ¶ 12. Nevertheless, the officer chose to take the more prudent course of obtaining a search warrant. And, as the United States Supreme Court has explained, "[g]iven probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant."). And here, where a search warrant affidavit for a urine sample was already in progress, the officers' decision to concurrently seek judicial approval for the automobile search afforded Perkins greater Fourth Amendment protection. *See Illinois v. Gates*, 462 U.S. 213, 236–37 & n.10 (1983) (explaining "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant"); *State v. Ashe*, 745 P.2d 1255, 1267 n.59 (Utah 1987) ("The government should actively encourage its law

---

4. The officers may have also had Perkins's valid consent to search, another exception to the warrant requirement. *See State v. Bisner*, 2001 UT 99, ¶ 43, 37 P.3d 1073 (noting that one exception to the warrant requirement "includes searches conducted pursuant to consent").

enforcement agents to seek search warrants whenever possible and by any available means provided by statute. Judicial officers should cooperate to the utmost in promoting this policy.").

¶30　We further conclude that the time between the drug dog alert on Perkins's truck and the issuance of the warrant was not unreasonably lengthy. As detailed above, Officer Pearce was conducting a dual investigation of two people at two locations during the relevant time period. When Officer Pearce was notified of the drug dog alert, he was still at the residence. As soon as the search of the residence was completed at approximately 12:45 p.m., Officer Pearce went directly to Perkins's location, working on the affidavit for the search warrant during the twenty-minute drive. The warrant was submitted at 1:31 p.m., shortly after Officer Pearce arrived on the scene. Officer Pearce placed calls to the court to locate an available magistrate to ensure that the warrant would be promptly reviewed. Under these circumstances, we agree with the district court that the officers acted with due diligence and obtained a search warrant in a timely manner.

CONCLUSION

¶31　We conclude that the officers had reasonable suspicion of criminal activity that justified detaining Perkins for further investigation. We further conclude that the detention was not unreasonably lengthy, given the simultaneous investigations, the distance between the locations, the road conditions at the time, and the developing information. Accordingly, we affirm the denial of the motion to suppress.

———————