2006 UT 26

**STATE of Utah, Plaintiff and Petitioner,**

**v.**

**Lew ISON, Defendant and Respondent.**

**No. 20040807.**

Supreme Court of Utah.

April 28, 2006.

Mark L. Shurtleff, Att'y Gen., Charlene Barlow, Brett Delporto, Asst. Att'ys Gen., Salt Lake City, for petitioner.

John Pace, Salt Lake City, for respondent.

NEHRING, Justice:

## INTRODUCTION

¶ 1 This appeal is the latest chapter in the saga of a Carribean cruise that set sail in November 1995 and the alleged misdeeds of Lew Ison, the man accused of frustrating the vacation plans of would-be passengers on that cruise.

¶ 2 Mr. Ison was convicted of two counts of communications fraud. He appealed his conviction to the court of appeals, where he argued that his counsel had been ineffective. The court of appeals agreed and ordered a new trial. We granted the State's petition for certiorari to consider whether the court of appeals erred in ruling that Mr. Ison's counsel was ineffective when he (1) failed to seek the introduction into evidence the results from an administrative adjudication that exonerated Mr. Ison and (2) failed to object when the trial court responded to a written question asked by the jury during its deliberations by stating that a contract that appeared to assign Mr. Ison responsibility for the fate of the cruise passengers was "legal and binding." We affirm the court of appeals.

## FACTS

¶ 3 Aristocrat Travel was a travel agency located in Bountiful, Utah. Aristocrat agreed to sell sixty-two cabins for a November 1995 Carribean cruise on a Norwegian Cruise Line vessel. Under the agreement, Aristocrat was to collect money from passengers in installments and forward the funds to Norwegian—making the final payment one month before the cruise departed.

¶ 4 One month before the final payment to Norwegian was due, Aristocrat's owner, Le-Mar Lee Fiet, agreed to sell the company's assets, including its agency bookings, to Mr. Ison's company, Continental Travel. The agreement stated, in part:

> Seller [ (Aristocrat) ] covenants that all deposits for cruise and tour bookings have been paid over to the cruise line or tour operator. Any deposits not having been paid over shall be delivered to Buyer. On confirmation by Buyer [ (Continental) ] that all cruise and tour deposits have been paid to the cruise lines, tour operators or received by Buyer, Buyer assumes all responsibilities for the cruise and tour bookings transferred to Buyer.

¶ 5 Continental agreed to pay Aristocrat $60,000 for its assets with $10,000 due at the closing of the transaction. Mr. Ison wrote a $7,000 and a $3,000 check to meet the $10,000 payment obligation, but stopped payment when he discovered that Aristocrat had failed to pay a $3,000 telephone bill. The unpaid telephone bill was presumably a matter of some importance since Aristocrat's telephone numbers were among the assets purchased by Continental. About the same time, Mr. Ison discovered that Mr. Fiet had *not* paid the deposits required to secure the Norwegian cruise. Mr. Ison asked an Aristocrat employee to audit the company's books for information regarding payments made toward the Norwegian cruise. The employee told Mr. Ison that more money was needed to secure the cruise, although it was unclear how much.

¶ 6 Mr. Ison sent a letter to Mr. Fiet accusing him of personally taking and disposing of $13,000 in deposits designated for the Norwegian cruise. He then told Mr. Fiet that he would no longer honor their agreement.

¶ 7 Mr. Ison contacted the cruise passengers and explained that some of the money paid to Aristocrat had not been submitted to Norwegian. To resolve the situation he asked those who had paid the full price for the cruise to pay an additional $115 and those whom he could not confirm as having paid the full price (through Aristocrat or Norwegian paperwork) to pay the full cruise cost. A week later, he sent the passengers a second letter stating that "Fiet/Aristocrat had not remitted the funds paid by some of the travelers on the [November Cruise] to

[Norwegian]." He told the passengers that if the shortage was not made up the cruise would be cancelled, "whether they [had] paid full fare or not."

¶ 8 Mr. Ison further advised the passengers that "having rescinded the Agreement with Aristocrat, Continental [would] not assume liability for Aristocrat's actions in failing to remit the monies for said cruise." Instead, Mr. Ison offered the passengers a separate agreement with Continental to "take over" the situation, which, he assured them, Continental would likely resolve to their satisfaction.

¶ 9 To no one's surprise, the cruise passengers were not pleased by this course of events. Their complaints triggered investigations into Mr. Ison and Continental's conduct by both the Utah Attorney General and the State Division of Consumer Protection. As authorized by statute, the Division investigated the complaints and issued a citation to Mr. Ison. Mr. Ison exercised his right to a hearing on the charges made in the citation. "If the recipient of a citation makes a timely request for review, within ten days of receiving the request, the division shall convene an adjudicative proceeding in accordance with Title 63, Chapter 46b, Administrative Procedures Act." Utah Code Ann. § 13–2–6(3)(c) (2005). The Division then convened a hearing before an administrative law judge ("ALJ") who heard testimony and evidence as to whether Mr. Ison had violated Utah Code sections 13–11–4(2)¹ and 13–11–3(6).² The ALJ concluded that Mr. Ison had not violated either statute. In the course of reaching this conclusion, the ALJ found that Mr. Ison "made no misrepresentations to any passenger" and never "assumed responsibility for the cruise and tour bookings in question."

¶ 10 In spite of the ALJ's findings, the attorney general filed criminal charges against Mr. Ison for communications fraud under Utah Code section 76–10–1801.³ The case went to trial. During jury deliberations, the jury sent a note to the trial judge asking if the agreement between Mr. Fiet and Mr. Ison was a "legal and binding" contract during the alleged offense. The judge wrote "Yes" on the note, signed it, and returned it to the jury. The jury convicted Mr. Ison of two counts of communications fraud. He then appealed to the Utah Court of Appeals, which decided whether

> Defendant's trial counsel was ineffective for failing to move to admit the decision of the ALJ ... and was also ineffective for failing to object to the trial court's instruction to the jury that the purchase agreement between defendant and Fiet was "legal and binding."

*State v. Ison*, 2004 UT App 252, ¶ 23, 96 P.3d 374.

¶ 11 The court of appeals first considered whether the ALJ's findings were admissible and whether Mr. Ison's counsel was ineffective for failing to move to admit the ALJ's findings under Utah Rule of Evidence

---

1. Utah Code section 13–11–4(2) states:

 [A] supplier commits a deceptive act or practice if the supplier knowingly or intentionally:
 ...
 (j) indicates that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies, or obligations, if the representation is false;
 ...
 (*l*) after receipt of payment for goods or services, fails to ship the goods or furnish the services within the time advertised or otherwise represented ... unless within the applicable time period the supplier provides the buyer with the option to either cancel the sales agreement and receive a refund of all previous payments to the supplier....

 Utah Code Ann. § 13–11–4(2) (2001).

2. Utah Code section 13–11–3(6) (2001) defines a supplier as "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions whether or not he deals directly with the consumer."

3. Utah Code section 76–10–1801 states, in part:
 (1) Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of [a level of misdemeanor or felony based on the amount of defrauded money].

 Utah Code Ann. § 76–10–1801 (2003).

803(8)(C). *Id.* ¶ 15. The court concluded that the ALJ's findings were admissible under Utah Rule of Evidence 803(8)(C) as a record or report of a public agency based on a plain language interpretation of the rule. *Id.* ¶ 16.

¶ 12 The court of appeals then held that Mr. Ison's counsel was ineffective for failing to move for admission of the ALJ's findings. *Id.* ¶ 19. It reasoned that because "trial counsel was aware of the ALJ decision, which appears in the record, and because it would have helped exonerate Defendant, there was no strategic move for not moving for its admission." *Id.* Therefore, counsel's failure to seek admission of the ALJ's findings was "below the standard of reasonable professional assistance." *Id.* (citing *State v. Dunn,* 850 P.2d 1201, 1225 (Utah 1993)).

¶ 13 The court of appeals also held that Mr. Ison's trial counsel was ineffective because he failed to object to the trial court's determination, made in response to the jury's written question, that the contract between Mr. Ison and Mr. Fiet was legally binding. *Id.* ¶ 20. The court of appeals reasoned that because no evidence was presented at trial on the issue of the contract's legal status, it was inappropriate for the trial court to summarily rule on its legality after the jury had retired. *Id.* ¶ 21. In fact, as the court of appeals noted, the trial court made no determination on the record that Mr. Ison was obligated to perform the contract without confirmation, which never came, that deposit money had been forwarded to Norwegian for the cruise. *Id.* In light of these errors, the court of appeals reversed Mr. Ison's convictions and granted him a new trial. *Id.* ¶ 23. The State petitioned for a writ of certiorari, which we granted.

## ANALYSIS

¶ 14 The State challenges the two premises which undergird the court of appeals' ineffective counsel determination. It contends that Mr. Ison's counsel could not have been ineffective because the ALJ's findings were not admissible and thus trial counsel was blameless for not seeking their admission into evidence. Similarly, because the trial judge provided the correct answer to the jury's

question, Mr. Ison's counsel had no reason to object to it.

## I. THE COURT OF APPEALS PROPERLY HELD THE ALJ'S FINDINGS ADMISSIBLE

 ¶ 15 Rule 803(8)(C) of the Utah Rules of Evidence authorizes the admission of hearsay that appears in the form of public records and reports. A court may admit into evidence, "in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness." Utah R. Evid. 803(8)(C).

¶ 16 We interpret evidentiary rules using the same time-honored methods we employ to draw meaning from writings generally. Accordingly, we look first to the plain meaning of the text of rule 803(8)(C) for guidance.

¶ 17 The State does not challenge the contention that the ALJ's findings were a report of a public agency. Furthermore, the State does not assert that what the Division labels "Findings of Fact" are not "factual findings" as that term is used in rule 803(8). Instead, the State insists that the Division's findings do not meet the requirements of rule 803(8) because they are not "factual findings resulting from an investigation." According to the State, the Division's findings were the "result" of an adjudication and not an investigation, and therefore fall outside the ambit of the rule.

¶ 18 To test the soundness of the State's argument, we must explore whether the connection between the ALJ's factual findings and the Division's investigation of Mr. Ison were so attenuated as to disqualify them from being considered the "result" of the investigation and whether there is something about the nature of the administrative hearing setting that so alters the character of factual findings made by the ALJ that they became the exclusive "result" of the administrative hearing and not the investigation that occasioned it.

¶ 19 We need not determine whether the Division conducted an investigation. It did. As the plain language of rule 803 makes clear, however, it is the product of the investigation, specifically its factual findings, and not the investigation itself that is eligible for consideration under the public report exception to the hearsay rule. An investigation is a process. In American popular culture, criminal investigations are closely associated with the detectives who conduct them; detectives who sport a fedora with a bent front brim in search of "Just the facts ma'am" or, who in the current fashion, possess skill in the use of the futuristic gadgetry of forensic science. Because it is a process, however, an investigation itself has no evidentiary significance. It is the data uncovered and the dots connected by the investigative process that acquire the potential for becoming evidence.

¶ 20 Regardless of whether an investigation is performed in the Holmesian (Sherlock, not Oliver Wendell) tradition of culling insights into the make-up of human beings from observations of dress, speech, and carriage or by employing the latest advances in genetics, chemistry, or physics, any report or other account of data gathered through the investigation is subjected to sifting and evaluation. Training, experience, and intuition are applied to the compilation of raw data, and a report emerges. Facts are found.

¶ 21 These factual findings inevitably bear traces of the processes used in their discovery. It is difficult indeed to imagine an investigatory report of a public agency that would, even under the narrowest interpretation of "investigation," be wholly free of what could be taken as opinion. Such reports would nevertheless qualify as factual findings under rule 803(8)(C).

¶ 22 The definition of "finding" in legal parlance both reinforces and refines its connection to the deliberative process and inevitable connection to "opinion." *Black's Law Dictionary* says that a "finding" is "[t]he result of the deliberation of a jury or a court. A decision upon a question of fact reached as a result of a judicial examination or investigation by a court, jury, referee, coroner etc." *Black's Law Dictionary* 632 (6th ed.1990). When "finding" is connected to "fact" the combination has a still greater legal valence. *Black's* defines a "finding of fact" as "[a] determination from the evidence of a case, either by a court or an administrative agency, concerning facts averred by one party and denied by another." *Id.* at 632.

¶ 23 The use of the term "factual findings" in rule 803(8)(C), laden as it is with legal overtones, indicates that the type of public agency report that the rule intends to shelter is one made by a person whom the law considers to be a finder of fact. So construed, an admissible report could be one containing the factual findings of Oliver Wendell Holmes, Jr., based on an investigation undertaken by Sherlock Holmes.

¶ 24 An essential point of this discussion is that the clear demarcation between investigations and adjudications urged on us by the State does not exist. Forensic investigations regularly yield factual findings that share characteristics with findings of fact determined in administrative adjudications. Those same adjudications, at least insofar as they seek to uncover truth, are themselves investigations. A plain reading interpretation of rule 803(8)(C) acknowledges these overlapping domains and, we conclude, clearly extends the reach of the public agency report into the realm of administrative adjudications.

¶ 25 In reaching this conclusion, we are in accord with United States Supreme Court jurisprudence relating to Federal Rule of Evidence 803(8)(C), a rule identical to Utah's. In *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), widows of deceased Navy pilots sued the manufacturer of the airplanes they believed malfunctioned in a Navy training exercise causing their husbands' deaths. *Id.* at 156, 109 S.Ct. 439. The application of rule 803(8) became a point of contention when the defense sought to introduce an investigative report of the crash that had been ordered by the commanding officer of the training squadron in which the deceased pilots served.

¶ 26 Justice Brennan's majority opinion tracked closely our methodology and result. It relied on the "traditional tools of statutory construction"—plain language meaning—to

interpret rule 803(8)(C). *Id.* at 161–70, 109 S.Ct. 439. Justice Brennan first turned away an attempt to rein in the application of rule 803 (as the State seeks to in this case) by exploiting a "perceived dichotomy between 'fact' and 'opinion' in arguing for the limited scope of the phrase 'factual finding.'" *Id.* at 163, 109 S.Ct. 439. He reasoned that "it is not apparent that the term 'factual findings' should be read to mean simply 'facts.'" *Id.* at 163–64, 109 S.Ct. 439.

¶ 27 Justice Brennan, too, looked to *Black's* definition of "finding of fact" as "[a] conclusion by way of reasonable inference from the evidence." *Id.* (citing *Black's Law Dictionary* 569 (5th ed.1979)). Drawing on this definition, Justice Brennan reasoned that "the language of the Rule does not compel us to reject the interpretation that 'factual findings' includes conclusions or opinions that flow from a factual investigation." *Id.* at 164, 109 S.Ct. 439. Based on a plain review of the text, he felt that it is clear "the language of the Rule does not state that 'factual findings' are admissible, but that '*reports* . . . setting forth . . . factual findings are admissible.'" *Id.* (emphasis in original).

¶ 28 We share Justice Brennan's refusal to endorse a categorical distinction between fact and opinion in the context of rule 803(8)(C) and find in it further support for our view that the rule cannot accept mutually exclusive understandings of investigation and adjudication.

¶ 29 In this case, we have little difficulty concluding that the factual findings in the ALJ report "resulted" from an investigation. Rule 803(8)(C) does not provide explicit guidance concerning the degree of causal proximity between factual findings and an investigation necessary to satisfy the "resulting from an investigation" requirement. The Consumer Protection Division's hearing would not have occurred had the Division not conducted its investigation of Mr. Ison. The hearing and the factual findings it produced were events in a direct statutory sequence that commenced with the passengers' complaints and the Division's investigation.[4]

¶ 30 The hearing put to the test the Division's conclusion that its investigation warranted the issuance of a citation against Mr. Ison for violations of Utah Code sections 13–11–4(2) and 13–11–4(6) (2001). The ALJ determined, based on factual findings, that the Division's investigation failed the test. Those factual findings, including those that Mr. Ison points to in support of his claim of ineffective assistance of counsel, therefore "resulted from" the Division's investigation.

¶ 31 Rule 803(8)(C) of the Utah Rules of Evidence presumptively invites admission of a public agency report "unless the sources of information or other circumstances indicate lack of trustworthiness." The State's sole attack on the trustworthiness of the ALJ's findings is that the record does not contain evidence "that the ALJ had any special expertise or experience in the matters presented at the hearing that would make his findings trustworthy." Inasmuch as the State fails to provide us with any indication of its own regarding what matters it refers to or what special expertise or experience the ALJ would have had to possess in order to lend sufficient trustworthiness to his findings, we reject this argument. We note, however, that the ALJ is presumed to be an impartial fact finder. In conducting an impartial evaluation of competing claims to fac-

---

4. Utah Code section 13–2–6 states:

(3) If the division has reasonable cause to believe that any person is engaged in violating any chapter listed in Section 13–2–1, the division may promptly issue the alleged violator a citation signed by the division's director or his designee. . . .
(c) If the recipient of a citation makes a timely request for review, within ten days of receiving the request, the division shall convene an adjudicative proceeding in accordance with Title 63, Chapter 46b, Administrative Procedures Act.

(d)(i) If the presiding officer finds that there is not substantial evidence that the recipient violated a chapter listed in Section 13–2–1 at the time the citation was issued, the citation may not become final, and the division shall immediately vacate the citation and promptly notify the recipient in writing.
(ii) If the presiding officer finds there is substantial evidence that the recipient violated a chapter listed in Section 13–2–1 at the time the citation was issued, the citation shall become final and the division may enter a cease and desist order against the recipient.
Utah Code Ann. § 13–2–6 (2005).

tual truth in the service of rendering a decision in an administrative proceeding like the one that occurred here, an ALJ is called upon to exhibit considerable expertise and experience.

¶ 32 We are not persuaded that Mr. Ison's counsel can be excused for not seeking to introduce the ALJ's findings because the issue of whether the ALJ report came within rule 803(8)(C) was an open question in our courts. Mr. Ison would have alerted his counsel that the ALJ had exonerated him of charges that he had violated the Consumer Sales Practices Act. Indeed, is it possible that Mr. Ison did not have feelings of indignation upon learning that he was facing criminal charges based on the same alleged misrepresentations that the ALJ had found he did not make? The ALJ's findings were potentially very powerful exculpatory evidence. We agree with the court of appeals that there was no strategic reason not to seek admission of the ALJ's findings. Surely, competent counsel would scour the exceptions to the hearsay rule in search of a means to place the findings in the hands of the jury.

¶ 33 Our observation that the ALJ's findings packed considerable potential evidentiary punch does not lead us to conclude that the findings were unacceptably prejudicial. Our confidence in the capabilities of juries extends to our belief that, aided by properly crafted instructions, they may understand the function and authority of the ALJ within the executive branch of government and appropriately weigh his findings. Moreover, the court of appeals was correct to observe that the speculative possibility that the trial judge might have exercised his discretion and ruled that the prejudice of the ALJ's findings substantially outweighed its probative value and therefore rejected the proposed evidence pursuant to rule 403 of the Utah Rules of Evidence does not justify failing to offer otherwise admissible evidence.

¶ 34 We therefore affirm the court of appeals' holding that Mr. Ison was afforded ineffective assistance of counsel based on the failure to offer into evidence the ALJ's findings relating to Mr. Ison's alleged misrepresentations and absence of contractual obligation to the cruise passengers.[5]

## II. MR. ISON'S COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE TRIAL COURT'S ANSWER TO THE JURY'S QUESTION ON THE VALIDITY OF THE CONTRACT

¶ 35 Finally, we review whether Mr. Ison's counsel was ineffective because he did not object to the trial court's single-word answer, "Yes," to the jury's request to know whether the contract between Mr. Ison and Mr. Fiet was "legal and binding." Complicating this issue is the fact that the only record of this interaction is the slip of paper containing the jury's question and the judge's answer. We agree with the court of appeals that Mr. Ison has properly preserved this issue despite the absence of a record from which we could understand the circumstances surrounding and the reasons for the trial court's treatment of the jury's question. We also agree that the trial court's direction that the jury find a "legal and binding" contract was both erroneous as a matter of law and prejudicial to Mr. Ison.

### A. Lack of Record Does Not Negate the Ineffective Assistance of Counsel Claim

¶ 36 The State contended before the court of appeals that Mr. Ison was foreclosed from challenging the jury question issue on appeal because his counsel failed to preserve the issue by objecting to the judge's answer on the record. The court of appeals dispatched the State's argument with the observation that it would have been impossible for Mr. Ison to document his counsel's failure to

---

5. Our analysis is limited to the court of appeals' determination that the performance of Mr. Ison's counsel "fell below the standard of reasonable professional assistance," *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993), the first of a two-part test adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 686– 87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to evaluate claims of ineffective assistance of counsel. The State has not challenged part two, that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different. We therefore do not consider it.

object, because the trial court responded to the jury's question off the record. Another way of looking at Mr. Ison's dilemma is that *but for* his attorney's ineffective assistance, the trial court would not have responded to the jury's question off the record. Thus, because of the ineffective assistance of Mr. Ison's counsel, no record exists to establish whether counsel objected to the question or not.

¶ 37 Now, before us, the State contends that without a record to substantiate Mr. Ison's claim, we must assume both that a record of the events surrounding the jury question exists *and* that Mr. Ison's failure to include this portion of the record on appeal requires us to infer that no error occurred. This multi-layered presumption places, in our opinion, too much strain on the interests of justice.

¶ 38 The State is correct when it asserts that a defendant must substantiate his arguments by pointing to the record. The State further correctly notes that claims of error cannot ordinarily be founded on matters not present in the record on appeal, because "[w]hen crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *State v. Pritchett,* 2003 UT 24, ¶ 13, 69 P.3d 1278.

¶ 39 We agree with the court of appeals; however, we have stopped short of conferring omnipotence to this rule.

> [T]hree exceptions to this general rule are recognized in Utah. An appellate court may address an issue for the first time on appeal if appellant establishes that the trial court committed "plain error," if there are "exceptional circumstances," or *in some situations*, if a claim of ineffective assistance of counsel is raised on appeal even though, by reason of the claimed ineffectiveness, the matter was not raised below.

*State v. Irwin,* 924 P.2d 5, 7 (Utah Ct.App. 1996) (emphasis added) (citations omitted).

¶ 40 Furthermore, we have expressly recognized in our rules of appellate procedure that evidence of deficient performance by counsel may exist outside of the record and may be used in support of a claim of ineffective assistance. *See* Utah R.App. P. 23B(a).

¶ 41 In this case, Mr. Ison does not claim "plain error" or "exceptional circumstances." Instead, he argues that the situation presented is one of the limited situations in which a claim of ineffective assistance of counsel may preserve an issue not raised below. Where a claim of ineffective assistance is grounded in the absence of a record, a party may not gain the benefit of the presumption of regularity without a showing that the party claiming error consented to or acquiesced in the off-the-record treatment of a matter giving rise to the ineffective assistance claim.

¶ 42 Special care must be taken to discourage parties from attempting to avoid the preclusive effect of a failure to preserve an issue by claiming that the ineffective assistance of counsel should be blamed for the void in the record where an issue-preserving objection would otherwise have appeared. We exercise such care here in affirming the court of appeals. The deficiency of a written question to the court from a deliberating jury is, while not an infrequent occasion, one that suffers from an absence of procedural guidance. As this case illustrates, a trial judge who takes up a jury question off the record does so at considerable peril. We can imagine few, if any, instances in which a trial court could appropriately dispense with a record when confronted with a jury question.

¶ 43 Because of the unique circumstances attendant to a jury inquiry made during deliberations, we find it appropriate to recognize this as one of the very limited circumstances contemplated by *Irwin* when ineffective assistance of counsel may excuse a failure to preserve an issue on the record. "An appellate court may address an issue for the first time on appeal … in some situations, if a claim of ineffective assistance of counsel is raised on appeal even though, by reason of the claimed ineffectiveness, the matter was not raised below." *Irwin,* 924 P.2d at 7.

*B. The Court of Appeals Correctly Determined That the Question of Whether the Contract Was "Legal and Binding" Should Have Been Decided by the Jury After Hearing the Evidence*

¶ 44 The trial judge exceeded his discretion when he directed the jury that the

agreement was "legal and binding," and Defendant's counsel's failure to object rendered his performance below the standard of "professional assistance" required by *Dunn*, 850 P.2d 1201 (Utah 1993).

¶ 45 The State correctly reminds us that we must ordinarily presume that a trial court's decision is based on reasonable factual determinations. We cannot, however, extend the court the benefit of this presumption here because *no* evidence was offered about the obligations that may or may not have existed under the contract.

> [I]n cases in which factual issues are presented to and must be resolved by the trial court but no findings of fact appear in the record, we assume that the trier of facts found them in accord with its decision, and we affirm the decision if from the evidence it would be reasonable to find facts to support it. If the ambiguity of the facts makes this assumption unreasonable, however, we remand for a new trial.

*State v. Ramirez*, 817 P.2d 774, 787 (Utah 1991) (internal quotation marks and citations omitted).

¶ 46 The trial judge's answer to the jury question was no less than a ruling that the agreement between Aristocrat and Continental was "legal and binding" as a matter of law. Such a ruling could have been justified if the "legal and binding" nature of the agreement was evident from the plain language of its text.

> When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling. *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599; *see also Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law.

*Bakowski v. Mt. States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179.

¶ 47 The text of the agreement did not permit this determination because, although the language of the agreement may have been clear, that language incorporated a condition precedent to Continental's performance—the verification that Aristocrat had properly forwarded the passengers' payments to Norwegian. The existence of this condition left the trial judge ill-equipped to know whether Continental's contractual duties had matured based only on the text of the agreement.

¶ 48 The trial judge's "Yes" answer to the jury's question meant that he had determined that Continental had satisfied this condition. He could not have reached this determination, however, without evaluating the evidentiary basis for it. This assessment required the trial judge to shift his attention from the text of the agreement to what Continental and Aristocrat actually did, or failed to do. This endeavor would have borne the unmistakable hallmarks of fact-finding. Of course, if the evidence that the trial judge uncovered relating to the performance of the condition had left the mind of any reasonable juror with no option but to find that Aristocrat had satisfied the condition, we would affirm the "Yes" answer to the jury question. The evidence does not, however, permit this outcome. The only evidence in the record on the topic of Aristocrat's performance of the condition precedent points to the conclusion that it had failed to satisfy it. Under these circumstances, we agree with the court of appeals that the trial court erred when it ruled as a matter of law that the agreement was "legal and binding."

¶ 49 We are unpersuaded by the State's contention that Mr. Ison's Continental "breached" the agreement because it failed to demand mediation of Aristocrat's failure to perform. As a general proposition of contract law, a failure to properly invoke a dispute resolution provision will not excuse a breach of a substantive contract term. This "breach" is apparently the most the State can muster in aid of its contention that Mr. Ison was obligated to perform Continental's contractual duties, despite uncontroverted evidence that Aristocrat never confirmed to Mr. Ison that it had protected the interests

of the passengers by advancing their deposits to Norwegian.

¶ 50 We are aware of no contract law authority, and the State has provided us with none, to support the proposition that a party's failure to pursue an agreed-upon alternative dispute resolution method would excuse the breach that created the dispute. That is certainly not the case here, where the agreement merely required mediation as a condition to litigation. Whether Mr. Ison demanded mediation or not, he did not have confirmation that the passengers' deposits, to which he was entitled under the agreement, had been properly accounted for. While he may well have been foreclosed from seeking a court's declaration that he was relieved of any duty to assume Aristocrat's obligations to the passengers until mediation had occurred, it was nevertheless entirely plausible for Mr. Ison to truthfully tell passengers that Continental had no responsibility for their bookings based on unambiguous contract language that imposed upon Continental the duty to honor the bookings only after Aristocrat properly accounted for them. Thus, while the evidence would provide considerable support to a claim that the trial court could have responded to the jury's question with a "No," there is no evidence to justify a "Yes" answer.

## CONCLUSION

¶ 51 We affirm the court of appeals. The ALJ report was admissible under rule 803(8)(C), and defense counsel's failure to move for the report's admission constituted ineffective assistance of counsel. We also affirm that the trial court erred in communicating to the jury that the contract was "legal and binding," and Mr. Ison's attorney's failure to object on the record constituted ineffective assistance of counsel as well.

¶ 52 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.