2008 UT App 115

**STATE of Utah, Plaintiff and Appellee,**

v.

**Luke Zachary BAKER, Defendant and Appellant.**

No. 20060218–CA.

Court of Appeals of Utah.

April 3, 2008.

Aaron P. Dodd, Provo, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Marian Decker, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before THORNE, Associtae P.J., DAVIS, and ORME, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Appellant Luke Zachary Baker entered a *Sery* plea after the trial court denied his motion to suppress. *See generally State v. Sery,* 758 P.2d 935, 937–40 (Utah Ct.App. 1988). Baker contends that the trial court improperly denied his motion to suppress because, he asserts, from the moment the officers placed the driver under arrest, Baker, a passenger in the driver's vehicle, was unlawfully detained. We agree, and thus reverse and remand.

## BACKGROUND [1]

¶ 2 In the early morning hours of September 30, 2004, Baker was riding in the back-

---

1. "We recite the facts in detail because the legal analysis in a search and seizure case is highly fact dependent." *State v. Warren,* 2003 UT 36,

seat of a car traveling through Pleasant Grove, Utah. Pleasant Grove Police Officer Raymond Robertson noticed the car's license plate was not illuminated. Accordingly, he initiated a traffic stop.

¶ 3 As he approached the vehicle, Officer Robertson noticed a knife in a leather sheath on the thigh of a passenger in the back seat. At approximately 1:21 a.m., Officer Robertson ran a warrants check on the driver and discovered that her license had been "suspended for drugs." Officer Robertson then called for a K–9 unit to check the vehicle for controlled substances. Officer Robertson testified at the preliminary hearing that there was "no other reason" for requesting the K–9 unit. After he finished talking to dispatch, Officer Robertson walked back to the vehicle and proceeded to arrest the driver.

¶ 4 Responding to dispatch, additional officers—Pleasant Grove Police Officer Mike Bartell and Orem City Police Officer Chris Rockwood—arrived on the scene to assist Officer Robertson. By the time Officer Bartell arrived, the driver was already out of the vehicle and under arrest. Officer Robertson informed the other officers of the knife, and Officer Bartell proceeded to seize the knife while Officer Robertson processed the driver.

¶ 5 Officer Bartell then spoke to the backseat passenger whom Officer Robertson had seen with the knife. This passenger volunteered that he had a knife sitting on his thigh. Officer Bartell responded that he "better take the knife until we finish up with the stop." Officer Bartell then asked the passengers if there were any more knives in the car. The passengers, including Baker, then handed Officer Bartell approximately twelve other knives, including a set of throwing knives. Officer Bartell testified at the suppression hearing that none of the passengers said or did anything to make him fear for his safety once the knives were confiscated. Officers Rockwood and Robertson con-

curred with this assessment. Yet Officer Robertson testified at the preliminary hearing that the passengers were not free to leave until the K–9 unit arrived.

¶ 6 At approximately 1:33 a.m., Officer Robertson placed the driver in the back of his patrol car, and at 1:34 a.m., Orem City Police Officer Art Lopez arrived with a police service dog. At this time, Baker and his three remaining riding companions were still seated in the vehicle with the engine turned off. The dog then sniffed around the car and indicated that it smelled drugs. Accordingly, Officer Rockwood frisked the passengers and found a glass pipe in Baker's pants pocket and another in his shoe. At the suppression hearing, Officer Robertson testified that the reason the officers searched Baker was not because they were afraid for their safety, but was instead because they wanted to check for drugs and contraband. Baker was then placed in handcuffs and taken to the police station. In the process of booking Baker, police officers found a bag containing seventy-one grams of methamphetamine.

¶ 7 Baker was charged with possession of a controlled substance in a drug-free zone and possession of drug paraphernalia in a drug-free zone. Baker moved to suppress the evidence of the glass pipes and methamphetamine. After a hearing, the trial court denied Baker's Motion to Suppress. The trial court ruled that given the lateness of the hour, the number of passengers, the number of knives, and the ongoing arrest of the driver, Baker "was not 'detained' for the purposes of the Fourth Amendment." Using the same set of facts, with the addition of the K–9 unit's detection of drugs, the trial court similarly ruled that "it could not be much more clear that the officers reasonably believed that [Baker] and the other passengers were armed and dangerous." [2] Baker now appeals the denial of his Motion to Suppress.

---

¶ 2, 78 P.3d 590 (citing *State v. Hansen*, 2002 UT 125, ¶ 5, 63 P.3d 650).

**2.** The trial court also stated that Baker "[did] not make any attenuation challenge to the actual time length of the stop or in connection with the K–9 request, etc." However, Baker preserved

his challenge to the unlawful nature of the detainment in his Motion to Suppress, stating that "[h]e was detained without either probable cause or reasonable suspicion, both before and after the K–9 unit arrived."

## ISSUE AND STANDARDS OF REVIEW

¶ 8 Baker argues that the trial court erred by denying his Motion to Suppress. "On review of both criminal and civil proceedings, we accept the trial court's findings of fact unless they are clearly erroneous." *Von Hake v. Thomas,* 759 P.2d 1162, 1172 (Utah 1988); *see also State v. Ison,* 2006 UT 26, ¶ 22, 135 P.3d 864 (defining a factual finding). "We review the trial court's ruling on a motion to suppress for correctness, without deference to the trial court's application of the law to the facts." *Layton City v. Oliver,* 2006 UT App 244, ¶ 11, 139 P.3d 281 (citing *State v. Brake,* 2004 UT 95, ¶ 15, 103 P.3d 699).[3]

## ANALYSIS

¶ 9 Baker argues that he was unlawfully detained from the moment the driver was arrested and that he was illegally frisked. We analyze each argument separately.

### I. The Detention

¶ 10 "When a police officer makes a traffic stop, the driver of the car [and the passengers are] seized within the meaning of the Fourth Amendment." *Brendlin v. California,* —— U.S. ——, ——, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007). Thus, both driver and passenger "may challenge the constitutionality of the stop." *Id.* "[A] seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 2405 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)); *accord State v. Jackson,* 805 P.2d 765, 767 (Utah Ct.App.1990). "When challenged, the [S]tate has the burden of proving the reasonableness of the officer's actions during an investigative detention." *State v. Worwood,* 2007 UT 47, ¶ 23, 164 P.3d 397 (citing *Florida v. Royer,* 460 U.S. 491, 497–500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v.*

*Carhee,* 27 F.3d 1493, 1496 & n. 2 (10th Cir.1994)).

¶ 11 "Due to the mobile nature of vehicles and their highly-regulated status, persons traveling in vehicles have a lesser expectation of privacy than they would have within a private dwelling." *State v. James,* 2000 UT 80, ¶ 10, 13 P.3d 576. And "officers may temporarily detain a vehicle and its occupants upon reasonable suspicion of criminal activity for the purpose of conducting a limited investigation of the suspicion." *Id.* This "articulable suspicion" must be "that the person has committed or is about to commit a crime; however the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *State v. Deitman,* 739 P.2d 616, 617–18 (Utah 1987) (internal quotation marks omitted); *see also State v. Chism,* 2005 UT App 41, ¶ 15, 107 P.3d 706 ("No person may be detained except upon reasonable suspicion, and the scope of the detention must be limited to addressing the articulated grounds for the stop."). "The articulable facts supporting reasonable suspicion are usually grounded in an officer's personal perceptions and inferences" but may also include external information. *Kaysville City v. Mulcahy,* 943 P.2d 231, 234 (Utah Ct.App.1997). "[W]e 'look to the totality of the circumstances ... to determine if there was an objective basis for suspecting criminal activity.'" *State v. Beach,* 2002 UT App 160, ¶ 8, 47 P.3d 932 (omission in original) (quoting *State v. Humphrey,* 937 P.2d 137, 141 (Utah Ct.App.1997)). "Investigative acts that are not reasonably related to dispelling or resolving the articulated grounds for the stop are permissible only if they do 'not add to the delay already lawfully experienced' and do 'not represent any further intrusion on [the detainee's] rights.'" *Chism,* 2005 UT App 41, ¶ 15, 107 P.3d 706 (alteration in original) (citation omitted); *see also United States v. McSwain,* 29 F.3d 558, 561 (10th Cir.1994) (finding the detention unlawful once the officer had discovered that

---

**3.** Baker also contends that even if the trial court properly ruled on the suppression motion respecting the Fourth Amendment, we should reverse because the police officers' actions violated Baker's rights under article 1, section 14 of the Utah Constitution. *See* Utah Const. art. I, § 14. Because Baker makes this argument for the first time on appeal, we decline to address it. *See State v. Dunn,* 850 P.2d 1201, 1216 (Utah 1993) ("Utah appellate courts generally will not address a state constitutional argument made for the first time on appeal.").

detainee's car's registration sticker "was valid and had not expired"); *Chism,* 2005 UT App 41, ¶ 17, 107 P.3d 706 (determining that continued detention of a defendant was unlawful when the officer provided "no specific, articulable facts supporting his unwillingness to accept the date of birth on [the defendant's] license"); *State v. Bissegger,* 2003 UT App 256, ¶¶ 19–20, 76 P.3d 178 (holding that detaining a motorist on suspicion of intoxicated driving after successful performance of field sobriety tests was unlawful, and therefore unreasonable).

■ ¶ 12 Here, the State, citing *Maryland v. Pringle,* 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), argues that the K–9 unit search was part and parcel of the traffic stop and hence Baker was not unlawfully detained. However, the driver was arrested well before the K–9 unit arrived. Placing her in the patrol car, which occurred only a minute before the K–9 unit was on the scene, was, at best, a ministerial act. We see no lawful reason why the passengers were detained while the officers awaited the arrival of the K–9 unit. The constitution, not the speed with which police officers dispatch their duties, determines when an arrest occurs. *Cf. Worwood,* 2007 UT 47, ¶ 24 n. 31, 164 P.3d 397.

¶ 13 Moreover, the desire to check the vehicle for controlled substances did not require the presence of the passengers,[4] yet Officer Robertson admitted that the passengers were not free to leave while the K–9 unit was en route. Thus, the officers needed some reasonable articulable suspicion to lawfully detain Baker and the other passengers while awaiting the K–9 unit's arrival. At the time Officer Robertson requested a K–9 unit,

the officers had seen only one knife in a passenger's possession (and not in Baker's possession). While it was the early morning hours, and there were four passengers in the car, nothing in the officers' testimony indicates any particularized suspicion involving criminal activity on the part of the passengers; thus, continued detention was impermissible.[5] *See State v. Chapman,* 921 P.2d 446, 453 (Utah 1996) (determining that continued detention of the defendant was impermissible when "[b]y the officers' own testimony, no independent facts surrounding the encounter with [the defendant] created suspicion that he was involved in any illegal activity beyond [the reason he was initially stopped]"); *cf. Pringle,* 540 U.S. at 373, 124 S.Ct. 795 (determining that the large amount of money and drugs in the car made it "reasonable for the officer to infer a common [criminal] enterprise among the three [occupants of the car]"); *United States v. Di Re,* 332 U.S. 581, 593–94, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (stating that where police officers have no evidence or information implicating a suspect, "mere presence" in the car does not give officers probable cause to believe that a suspect was involved in a crime). Accordingly, we hold that Baker's detention following the driver's arrest was in violation of his Fourth Amendment rights and that all evidence subsequently recovered must be excluded. *See State v. Hansen,* 2002 UT 125, ¶ 62, 63 P.3d 650; *State v. Larocco,* 794 P.2d 460, 472 (Utah 1990).

## II. The Frisk

■ ¶ 14 The State argues that even if the officers had no reasonable articulable suspicion of any criminal activity on the part of the passengers, the frisk of Baker was

---

4. We note that *Illinois v. Caballes,* 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), in which a dog sniff was upheld as constitutional, is distinguishable from the present case because the K–9 officer in *Caballes* arrived and walked his dog around the car while an officer "was in the process of writing a warning ticket," *id.* at 406, 125 S.Ct. 834. The Court recognized that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407, 125 S.Ct. 834. The Court went on to contrast the facts in *Caballes* with those of *People*

v. Cox, 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275 (2002), where "a dog sniff ... occurred during an unreasonably prolonged traffic stop," which the Court determined to be "an unconstitutional seizure." *Caballes,* 543 U.S. at 407–08, 125 S.Ct. 834. Also, *Caballes* did not involve passengers. *See id.* at 406, 125 S.Ct. 834. Accordingly, the *Caballes* holding does not apply to the present case.

5. The record does not suggest, and the State does not contend, that possession of the knives was itself illegal.

warranted because, as the trial court ruled, "the officers reasonably believed that [Baker] and the other passengers were armed and dangerous." This ruling by the trial court was based on the following findings: it was dark, it was late at night, the driver had been arrested, there were four passengers who had been in possession of approximately thirteen knives, and a K–9 unit had detected controlled substances where the three passengers (including Baker) sat.

¶ 15 "The sole purpose" of a *Terry* frisk "is to protect the officer ... by neutralizing potential weapons." *State v. Warren*, 2003 UT 36, ¶ 13, 78 P.3d 590 (citing *Michigan v. Long*, 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).[6] " 'If a protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.' " *Id.* (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). "When probable cause is required, the [U.S. Supreme] Court has held that a lack of subjective belief cannot invalidate an otherwise objectively reasonable action." *Id.* ¶ 16. An officer's subjective interpretation that "a person may be armed and dangerous, like an officer's subjective interpretation of the facts to determine that a crime has been or is being committed, is one of several possible articulable facts a court may consider as part of the totality of the circumstances." *Id.* ¶ 21.

¶ 16 In *State v. Warren*, 2003 UT 36, 78 P.3d 590, a police officer "testified that he did not have any reason to believe that [the defendant] was armed. He also testified that [the defendant] did not do anything that caused him any concern." *Id.* ¶ 6. Yet the officer frisked the defendant for weapons. *See id.* The officer testified that he frisked the defendant "to promote the safety of officers and others" and that he performed such frisks "as a matter of routine on anyone he orders out of a vehicle." *Id.* The Utah Supreme Court held that such a frisk violated the Fourth Amendment. *See id.* ¶ 33 ("[T]he officer's safety concerns in this case were not sufficient to outweigh [the defendant]'s right to personal security."). Moreover, the court observed that "[i]n simple traffic stops where other indicia of dangerousness are absent, ordering the occupants of the vehicle out of the car clearly mitigates the inherent dangerousness of the stop." *Id.* ¶ 27.

¶ 17 Here, the State attempts to distinguish *Warren* by pointing to the number of knives that officers recovered from the passengers, including Baker, at the outset. However, *in this particular situation*, the mere presence of the knives, which had been confiscated at the time the officers decided to search the passengers, is not a "specific and articulable fact[ ] which, taken together with the rational inferences from [that] fact[ ], would lead a reasonable person to conclude that the suspect may be armed and presently dangerous." *See id.* ¶ 29 (internal quotation marks omitted).

¶ 18 Looking at the totality of the circumstances, nothing other than the knives gave police officers any reason to take precautionary steps. Even the most potentially threatening aspect of the stop—the many knives—demonstrates the lack of an objective danger. According to Officer Bartell's testimony, the knives were volunteered to him while the passengers were waiting to be on their way. Tellingly, the *Terry* frisk was not conducted until well after the officers collected the knives and only *after* the K–9 unit indicated the presence of drugs in the backseat of the vehicle. Perhaps this is why Officer Robertson admitted that "the reason that [the officers] decided to search ... Baker was not because [the officers] were afraid for [their] safety." In fact, all three officers testified as to having no heightened fear for their safety.

---

6. Although society's interest in promoting officer safety is great, that interest must be weighed against society's interest in protecting individual liberty.... Balancing these interests, courts have held that slight intrusions such as ordering a person out of a car or conducting background checks pursuant to a traffic stop are justifiable intrusions in order to allow officers to operate in safety. A *Terry* frisk is an intrusion of a greater magnitude. *State v. Warren*, 2003 UT 36, ¶ 25, 78 P.3d 590 (citations omitted) (discussing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Rather, as Officer Robertson admitted, "[t]he reason [the officers] did [the *Terry* frisk] was to search for drugs and contraband." Thus, we determine that the factors supporting the reasonableness of the frisk are insufficient and that the frisk violated Baker's constitutional rights.

## CONCLUSION

¶ 19 We hold that Baker was unlawfully detained from the moment the driver was placed under arrest. Similarly, we hold that the mere presence of the already-confiscated knives did not tip the scales in favor of an objectively reasonable concern for officer safety. We reverse and remand.

¶ 20 I CONCUR: GREGORY K. ORME, Judge.

THORNE, Judge (concurring):

¶ 21 I do not disagree with the majority opinion's determination that Baker was unlawfully frisked and that the contraband discovered on his person should be suppressed. I write separately, however, to clarify that I view the frisk as illegal *solely* because the length and scope of Baker's detention prior to the frisk was unreasonable under the circumstances. Accordingly, I would simply disallow the frisk as a fruit of an unlawful detention without addressing whether it might be justified as a *Terry* frisk for weapons. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

¶ 22 "The constitutionality of a search and seizure is determined by answering two questions: '(1) Was the police officer's action justified at its inception? and (2) Was the resulting detention reasonably related in scope to the circumstances that justified the interference in the first place?'" *Layton City v. Oliver*, 2006 UT App 244, ¶ 14, 139 P.3d 281 (quoting *State v. Lopez*, 873 P.2d 1127, 1131–32 (Utah 1994)). Until recently, there was some question about whether and when

a private vehicle's passengers are deemed detained during an ordinary traffic stop. Last year, the Supreme Court answered that question in *Brendlin v. California*, — U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007), holding that a passenger in a private vehicle that is pulled over by police is "seized from the moment [the] car [comes] to a halt on the side of the road," *id.* at 2410, and suggesting that the seizure continues until police indicate that the passenger is free to go, *see id.* at 2406–07 ("[A]ny reasonable passenger would have understood . . . that no one in the car was free to depart without police permission.").[1]

¶ 23 Returning to the two-part analysis described in *Layton City v. Oliver*, 2006 UT App 244, ¶ 14, 139 P.3d 281, I believe that it is implicit in the *Brendlin* opinion that this seizure of a vehicle's passengers is justified at its inception so long as the vehicle stop itself is justified. *See generally Brendlin*, — U.S. ——, 127 S.Ct. 2400. In the present case, the vehicle stop was supported by probable cause of a traffic violation and was clearly valid. Accordingly, I would deem Baker's seizure justified at its inception.

¶ 24 The question then turns to whether Baker's continued detention was "'reasonably related in scope to the circumstances that justified the interference in the first place.'" *Layton City*, 2006 UT App 244, ¶ 14, 139 P.3d 281 (citation omitted). In the context of a passenger detained solely as a result of a driver's traffic violation, this is not necessarily a simple question to answer. At one extreme, it could be said that the passenger's continued detention is not related in any way to the driver's traffic violation, and thus, the passenger's detention becomes illegal unless the officer informs the passenger, at the officer's earliest convenience, that the passenger is free to go. The other extreme is argued by the State in this case: that a passenger is legitimately detained so long as the driver is legitimately detained, however

---

1. In this case, not only did the police officers not inform Baker that he was free to go, they took at least one knife from him and retained it over the course of the stop. Police retention of personal property alone may be sufficient to establish a seizure under our existing case law. *See, e.g., Salt Lake City v. Ray*, 2000 UT App 55, ¶¶ 14–17,

998 P.2d 274 (explaining that, generally, a person is seized while the police hold their identification papers or other property). Accordingly, the police actions in this case provide an independent basis for concluding that Baker was seized for the duration of the stop.

long that might be. I do not subscribe to either of these positions and instead conclude that the validity of the passenger's detention, like most search and seizure questions, must be evaluated on a case-by-case basis looking at the totality of the circumstances. *See, e.g., State v. Rodriguez,* 2007 UT 15, ¶ 51, 156 P.3d 771 (examining " 'all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself' " (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985))); *State v. Marquez,* 2007 UT App 170, ¶ 11, 163 P.3d 687 ("[T]he reasonableness of any warrantless search must be determined on a case-by-case basis with the focus on the totality of the circumstances.").

¶ 25 I agree with the majority opinion that, under the circumstances of this case, police detention of Baker was not justified once the decision to arrest the driver was made. At that point, a brief traffic stop had turned into an indefinite detention. There was no possibility that Baker would shortly be allowed to continue on his way as the driver's passenger because the driver was not going to be allowed to leave. This significant change in the nature of the stop created, in my opinion, some obligation on the part of the officers to address the passengers' situation as unwilling detainees, with the ultimate result of informing the passengers in a timely manner that they were free to go.

¶ 26 I express no opinion on how the police might fulfill this obligation in any particular case, or how rapidly they must do so. I note that police officers must have significant latitude to do their jobs and that I would not ordinarily find constitutional violations to be created by a few seconds, or even a few minutes, of variation in police practice from one stop to the next. Others may disagree. *See State·v. Adams,* 2007 UT App 117, ¶ 19, 158 P.3d 1134 (Orme, J., dissenting) ("If football is a game of inches, Fourth Amendment

jurisprudence can be a matter of seconds."), *cert. denied,* 168 P.3d 1264 (Utah 2007). In this case, however, the police took no actions aimed at releasing the passengers over the ten to fifteen minutes between the driver's arrest and the drug dog's alert.

¶ 27 It is also relevant that the facts of this case suggest that Baker and the other passengers were being detained solely to await the arrival of the drug-sniffing dog. There seems to be no reason for their detention besides a desire that the dog screen the vehicle and all of its occupants for illegal drugs. Absent some separate justification for detaining Baker and the other passengers, each passenger's detention must be justified by individualized suspicion of the criminal behavior being investigated during the detention—in this case, possession of drugs.[2] I see no such individualized suspicion here. A passenger's mere presence in a vehicle driven by one whose driver license has been suspended because of drugs does not equate to reasonable suspicion that the passenger is involved with drugs. *Cf. State v. Potter,* 860 P.3d ·952, 956 (Utah Ct.App.1993) (stating that a convicted drug user's presence in a home is "not properly part" of the probable cause analysis required to justify a search warrant for drugs in the home). The State points to no other grounds for reasonable suspicion that Baker had drugs, and his detention for the sole purpose of being screened for drug possession was therefore impermissible.

¶ 28 In sum, a passenger who silently submits to police authority by remaining in a lawfully stopped vehicle is seized, but permissibly so in my opinion. *See generally Brendlin v. California,* —— U.S. ——, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). And, so long as the stop is likely to be resolved in a reasonably short period of time and the focus of the detention is solely on the driver, I see no per se unreasonableness in the passenger's secondary detention. Here, however,

---

2. The drug sniff of the driver and his car was likely entirely proper. *See Illinois v. Caballes,* 543 U.S. 405, 406–08, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (upholding dog sniff of· stopped vehicle so long as it does not extend otherwise legitimate stop). The driver had been taken into custody, and the delay pending the arrival of the drug dog did not extend his detention in any way. By contrast, if the passengers would otherwise have been allowed to proceed on their way, then their compelled presence pending the dog's arrival *did* extend their detention and must be justified by individualized reasons for doing so.

the driver's detention had effectively become permanent, and the investigatory scope of the detention had widened to include Baker as a target. Without some reason to independently suspect Baker of wrongdoing, this detention of Baker was unreasonable and represents a violation of his Fourth Amendment rights.

¶ 29 I would end the analysis at this point and reverse the trial court's suppression ruling. I see no reason to additionally address whether Baker's frisk was justified for officer safety reasons. If such a frisk had been timely performed, I might very well accede to it on officer safety grounds. *See State v. Warren*, 2003 UT 36, ¶ 13, 78 P.3d 590 ("[A]n officer may perform a protective frisk pursuant to a lawful stop when the officer reasonably believes a person is 'armed and presently dangerous to the officer or others.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))). Various factors might support a reasonable belief that Baker and his companions presented an armed danger to the officers conducting the stop—they outnumbered the police and were in possession of an unusually large array of knives, it was late at night, and at least the driver had some previous criminal involvement.

¶ 30 Nevertheless, the frisk in this case was not timely performed, but rather occurred after a substantial period of unlawful detention resulting from an unjustified desire to await the arrival of the drug-detection dog. As such, I believe it must be suppressed as the poisonous fruit of that unlawful detention even if it might have been justified if performed earlier in the stop. *See State v. Worwood*, 2007 UT 47, ¶ 50, 164 P.3d 397 (rejecting the "if we hadn't done it wrong, we would have done it right" defense of unconstitutional searches and seizures). For these reasons I concur in the result reached by the majority, but with the clarifications and reservations expressed herein.